# Richmond.

## RICE v. HARTMAN.

JANUARY 5th, 1888.

1. PRACTICE IN CHANCERY—*Creditors' bill.*—A bill to which the administrator, widow, and heirs are made defendants, and the prayer of which is that the amount of the complainant's debt be ascertained by a master commissioner; that an account of the assets, real and personal, and of the debts, of the estate, be taken; and for general relief, is a creditors' bill, though it does not profess to be filed in behalf of all the creditors of the decedent.

2. WILLS—*Contract for legacy—Suit to enforce.*—Where one in his lifetime, for a valuable consideration, promised to make a provision by his will for another, and dies without making it, the promisee is entitled to enforce the contract by a suit against the promisor's estate.

3. IDEM—*Case at bar.*—Here it appears that promisor had in his lifetime supported promisee's family for about eight years, and left him a small property by his will, and so fulfilled his promise:

HELD:

Plaintiff cannot, under the circumstances, maintain his suit for further compensation.

Appeal from decree of circuit court of Fauquier county, rendered December 20th, 1883, in the consolidated causes of Hartman and others against Hartman's administrator and others, and James M. Rice against Hartman's administrator and others. The decree being adverse to James M. Rice, he obtained an appeal to this court. Opinion states the case.

*Brooke & Scott,* for the appellant.

*W. H. Payne,* for the appellees.

LEWIS, P., delivered the opinion of the court.

The bill alleges that, by a contract between the complainant and the intestate, Peter Hartman, the latter bound himself to make provision by his will for the complainant or his family, and that he died without doing so. By reason whereof, it is further alleged, the complainant is a creditor of the estate in a large sum, which he puts at fifteen thousand dollars. The administrator and the widow and heirs at law are made defendants to the bill, and its prayer is that the amount of the complainant's debt be ascertained by a reference to a master commissioner; that an account of the assets, real and personal, and of the debts of the estate, and their priorities, be taken, and for general relief.

There was a demurrer to the bill, which the circuit court overruled, but the court, being of opinion that the evidence failed to make out a case which justifies the interposition of a court of equity, dismissed the bill; whereupon this appeal was taken.

1. The demurrer was rightly overruled. The acceptance by the complaint, the appellant here, of the offer contained in the letters of the intestate, which are set forth in the bill, constituted a contract, for the alleged violation of which the complainant was entitled to sue, and the bill is substantially a creditors' bill, and unobjectionable on its face. In *Duerson's adm'r v. Alsop*, 27 Gratt., 229, the bill, which was filed to subject the real estate, in the possession of the heirs of the deceased debtor, to the payment of the plaintiff's debt, prayed that an account of the debts of the estate, and all other necessary accounts, be taken, but said nothing of other creditors, yet the objection to the jurisdiction of a court of equity in the case was overruled. Under the prayer of the bill, said the court, "a decree for a general account may be entered, all the creditors permitted to come in and prove their debts, and all the assets administered in the one suit. The bill is therefore substanti-

ally a creditors' bill, although it does not profess to be filed in behalf of all the creditors of the decedent." See also *Ewing's adm'r* v. *Ferguson*, 33 Gratt., 548; *Hurn* v. *Keller*, 79 Va., 415; *Carter* v. *Hampton's adm'r*, 77 *Id.*, 631; *Piedmont Ins. Co.* v. *Maury*, 75 *Id.*, 508.

The bill in the present case was not filed for the specific performance of a contract, nor for the recovery of any specific property, but for an account and a settlement of the estate, and for payment of the demand asserted in the bill; that is to say, for the payment of such a sum as it is claimed the intestate ought, in pursuance of his contract, to have devised or bequeathed the complainant, or, in other words, a sum adequate to the comfortable maintenance and support of the complainant and his family. In cases of this sort, a court of equity has jurisdiction, not only because matters of account are involved, but because of the existence of a constructive trust in the personal representative, which a court of equity will execute, and also because in the present case the real estate in the possession of the heirs is sought to be subjected. And in order to ascertain what, if anything, ought to be allowed the complainant in such a case, the chancellor, in the exercise of a sound discretion, may direct an issue, as an incident of the suit, to be tried by a jury.

The case of *Robertson* v. *Hogsheads*, 3 Leigh, 667, referred to by counsel, is not in point. This is a creditor's suit, that was not, but was, in effect, a suit in equity to recover damages founded upon an alleged fraudulent misrepresentation in the sale of a tract of land. The cases are therefore clearly distinguishable. See 1 Story Eq., sec's 534, 546, *et seq.;* Schouler, Wills, sec. 453.

2. The decree is also right upon the merits. It is impossible to read the record, and come to any other conclusion than that if the appellant had brought an action at law to recover damages for a breach of the contract in question, he would have been entitled at most, to recover nominal damages only.

The facts are these: In November, 1879, the intestate died at an advanced age, leaving a considerable estate, consisting chiefly of lands lying in Fauquier county. He left a widow, but no lineal heirs. His collateral heirs were numerous. The appellant married a niece of the intestate's wife, and for some time carried on the business of a saddler and harness-maker at the village of Paris, in the said county. In 1871, he removed to the State of Missouri. Up to that time he appears to have accumulated of this world's goods little or nothing. The following year, at the request of the intestate, he returned to Virginia, and took up his abode at the house of the intestate, in consideration of a promise on the part of the latter to provide for him and his family. It does not appear that at the time of his leaving Missouri, his prospects there, in a business or pecuniary point of view, were flattering or even encouraging. Indeed, upon this point there is no evidence at all. The offer to him to return to Virginia was made a few months after his removal from the State, and appears to have been accepted without much hesitation, though not very definite in its terms. He had a wife and a number of children, to one of whom particularly the intestate was much attached.

The traveling expenses of the family to Virginia were borne by the intestate, and there is not a particle of evidence to show that the appellant has ever lost, or is likely to lose a penny by his acceptance of the intestate's offer. Indeed, it would seem that the acceptance of the offer, apart from any expectation of a testamentary provision, was a most advantageous arrangement for the appellant. His family were comfortably maintained for nearly eight years, without any expense whatever to himself. This of itself amply justified him in returning to the State, or at least, such is the fair inference from the record. And in addition to this, he was given by the intestate a house and lot worth upwards of five hundred dollars. He must have been both an indolent and improvident man, for although relieved of the burden of maintaining his family until the

death of the intestate in 1879, during all which time he was free to follow his trade, at the neighboring village of Paris, where he had formerly lived and worked, or to otherwise occupy his time as he saw fit, yet he seems, in all that time to have saved nothing from his own earnings.

It is not pretended that the services rendered by the family were valuable. The wife kept house for the intestate and her aunt, his aged wife, and the appellant and several of the children occasionally did work on the farm. But there is nothing to show that the value of the whole service rendered was equal to the cost of maintaining the family, nor is it claimed that it was. The case rests exclusively upon the alleged promise of the intestate to make provision for the support of the family, independently of any service to be rendered, as contained in his letters which are exhibited with the bill.

But the terms of the offer contained in those letters, which by acceptance become a contract, are not susceptible of the construction for which the appellant contends. The offer did not bind the intestate to devise or bequeath the appellant property of sufficient value to yield a sum adequate to the support of himself and family, but only to render him such assistance as would justify him in coming back to live with the intestate. In his first letter on the subject to the appellant, dated December 17, 1871, the intestate wrote: "I want you and your family to come back and live with us as long as we live. I am not satisfied, and if you will come, I will make it to your interest and the interest of your family to do so. I will make ample provision for you and family." And what he meant by this is explained in his second letter, written soon afterwards, in which he said: "What I mean by saying I will make it to your interest [and that of your family to come back] is that I will assist you now, and after I am no more will leave you or your family a sufficient amount to justify you in coming back. I want, now that I am getting old, to live in peace, and make myself as easy as possible."

There is evidence tending to show that some time before his death the intestate spoke of purchasing a farm, called the Shearman farm, in Fauquier county, worth about $10,000, with a view to settling it upon the appellant and his family. But as he did not do so, and died without making a will, the reasonable inference is, that his intention of giving or·devising anything to the appellant or to his family was abandoned. And why it was abandoned is explained, we think, by the evidence, which shows a probable and decided change of feeling on the part of the intestate towards the appellant. Thus one of the witnesses testifies that the intestate, on one occasion, spoke to him of the improvidence of the appellant, and on another he spoke of him as a hypocrite. The same witness also testifies that the intestate, during his last illness, complained to him of the treatment he received at the hands of the appellant and his family, saying "his wife was old and worn out, and that the family would go to bed at their usual hour and get up at sunrise, and never come near him." It is true, the witness admitted, upon cross-examination, that he was not very friendly with the appellant, but no attempt was made to impeach or to contradict him, and his statements must, therefore, be taken as true. His testimony, however, is not necessary to the decision of the case.

Under all these circumstances, we see no ground for a reversal of the decree complained of. The temptation to set up claims against the estates of dead men, like the one asserted in the present case, is very great, especially against the estates of those who die, as the intestate in the present case did, without lineal heirs; and when such claims are asserted, they should be strictly scanned. To use the language of Strong, J., in *Graham* v. *Graham's ex'ors*, 34 Pa. St., 475, "even if any such contract may be enforced, it can only be when it is clearly proved by direct and positive testimony, and when its terms are definite and certain;" for, he continued, "the danger attendant upon the assertion of such claims requires, as was

said by Chief Justice Gibson, that 'a tight rein should be held over them, by making the quality, if not the sum, of the proof a subject of inspection and governance by the court,' and by following strictly the rule prescribed." See also, *Cox* v. *Cox*, 26 Gratt., 305, 312.

In *Perrot* v. *Austin*, Cro. Eliz., 232, cited in Bac. Abr. tit. Executors, &c., (P.) 1, it was held that if one covenants that his executor shall pay 10 *l.*, an action lieth not, because, said the court, "it cannot be a debt in the executor, where it was not debt in the testator." But this decision was disapproved by Lord Mansfield, in *Plumer* v. *Marchant*, 3 Burr., 1380, who declared it to be an extraordinary case, and that there was a query upon it in the very book. And in *Powell* v. *Graham*, 7 Taunt., 580, (2 Eng. C. L., 223,) the contrary was expressly decided.

It is accordingly well settled, both in England and in this country, that while no action lies for services rendered in expectation of a legacy merely, without any contract express or implied, yet that where there is a promise founded upon valuable consideration, that provision will be made for the promisee by the promisor in his will, and the latter dies without making such provision, an action does lie, though the proof, as we have seen, must be clear and convincing. In *Martin* v. *Wright's adm'rs*, 13 Wend., 460, the intestate promised to make compensation for services rendered him by the plaintiff and his family, by providing in his will for the plaintiff's children. He died without doing so, and it was held that the plaintiff, in his own name, was entitled to recover of the estate such sum as the services rendered were reasonably worth.

So, in *Frost* v. *Tarr*, 53 Ind., 390, it was decided by the supreme court of Indiana that where a person contracts that, at his death, he will leave a certain share of his estate to another, in consideration of certain service to be performed by the latter, an action for damages will lie for the violation of

the contract, against the personal representative of the former—the service having been performed under the contract; and that the damages may be measured by the value of the portion promised, and not limited to the value of the service performed. See also, *Patterson* v. *Patterson*, 13 Johns., 379; *Robinson* v. *Raynor*, 28 N. Y., 494; *Shakespeare* v. *Markham*, 10 Hun., 311, 322; Schouler, Wills, sec's 453–4.

The contract in the present case, it may be added, being in writing, no question as to the statute of frauds arises in the case. See upon this point, *Gould* v. *Mansfield*, 103 Mass., 408.

The application of these principles to the case in hand, leads to the conclusion that in the most favorable view which can be possibly taken for the appellant, he is entitled to a nominal recovery only. But, as heretofore said, he has been already amply compensated for his return to Virginia, and thus the promise of the intestate has been substantially fulfilled. The latter doubtless thought so, as his dying without a will tends to show.

DECREE AFFIRMED.